# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. CR 16-2917 JAP** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **YUSEF CASANOVA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION TO COMPEL DISCLOSURE OF INFORMATION

Comes now the Defendant, Yusef Casanova, by and through his appointed counsel Brian Pori and pursuant to the Fifth Amendment of the United States Constitution to respectfully petition this Honorable Court to compel the disclosure of the following information:

1.   A list of all cases brought by the United States Attorney's Office resulting from the 2016 ATF sting operation conducted in Bernalillo County, New Mexico, (hereinafter, "ATF sting");
2.   In every ATF sting case:
    a.   Each defendant's race and ethnicity;
    b.   A complete history of each defendant's prior criminal convictions and arrests;
    c.   A statement of the prior criminal investigations, if any, that ATF had conducted into each defendant before initiating confidential informant contact;
    d.   Home address, address of arrest, address of most recent pre-ATF sting conviction, addresses of ATF sting-related

approaches, contacts, meetings, or recordings for each defendant;

    e.    State ID Number, IR number, Date of Birth, and Social Security Number of each defendant;

3.    The same information requested in ¶ 2 for all individuals who were investigated during the ATF sting operation, but who were not ultimately arrested and/or charged;

4.    Any grant proposals or funding requests delineating the purpose and intended effect of the ATF sting operation;

5.    Any policies, practices, or selection criteria which influenced or dictated target selection in the ATF sting cases;

6.    What, if anything, any confidential informant was told about the criteria being used to target individuals in the ATF sting;

7.    The number of confidential informants that the ATF used in the ATF sting and the number of those confidential informants who had knowledge of and/or contact with non-African American or non-Latino persons who could be targeted;

8.    All contemporaneous writings, records, and/or memorializations setting out the reasons the ATF gave for pursuing – or not pursuing – an individual for arrest in the ATF sting;

9.    The charging selection criteria for the ATF sting;

10.    All documents and communications, including all e-mails, memos, text messages, press releases, voicemail messages, audio and video recordings, between any persons employed or contracted by the ATF, related to: the investigation of any individuals pursuant to the ATF sting; the decision to investigate (or not to investigate) anyone pursuant to the ATF sting; the charging criteria for the ATF sting; the decision to charge (or not to charge) anyone as a result of the ATF sting; the race of any defendant in the ATF sting, and the decision to decline charging someone in the ATF sting. Such documents and communications include those made on personally owned devices and/or personally maintained e-mail accounts or social media accounts;

11.    All national and Phoenix Field Division ATF manuals, circulars, field notes, correspondence, or any other material which discusses "stings" or entrapment operations, including protocols and/or directions to agents and confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that targets do not seek to quit or leave the conspiracy before an arrest can be made, and how to ensure

that agents and confidential informants are not targeting persons for such operations on the basis of their race, color, ancestry, or national origin;

12.     All documents containing information on how supervisors and managers of the Phoenix Field Division ATF were to ensure and/or did ensure that their agents were not targeting persons on the basis of their race, color, ancestry, or national origin for these ATF sting cases, and what actions those supervisors and managers took to determine whether agents were, in fact, targeting persons for those reasons.

## I.     Background

### B.     The Albuquerque 2016 Sting

On August 12, 2016, the United States Attorney's Office for the District of New Mexico issued a press release announcing that "Federal Investigation Targets Violent Crime in Bernalillo County" and that 108 individuals had been charged "as a result of the ATF-led investigation pursued in support of federal 'worst of the worst' anti-violence initiative."[1]  Around this time, the ATF-led sting that purported to target the "worst of the worst" brought a steady stream of defendants into federal court. Defense attorneys in New Mexico, attorneys with the FPD office, and members of the CJA panel, noticed an unusual characteristic of this pool of defendants—there were predominantly more black defendants than typically seen in federal cases in this district. Statistical evidence confirms these

---

[1] While the ATF and DOJ have dubbed this part of the "worst of the worst" initiative, this particular ATF sting could more accurately be dubbed the "pinching the penniless" initiative, given the high number of poor, low-level drug addicts and drug dealers who were caught up in the sting and who, as a result of financially insignificant sums of

early observations. In a city where African-Americans make up only 3.4 percent of the population, African-Americans represent 26 percent of the defendants charged in the ATF-led sting, an increase by a factor of eight. In a similar comparison, in the District of New Mexico, African-American defendants comprise 5.4% of drug cases and 5.9% of firearms cases. These statistics beg for an explanation.

In Mr. Cassanova's case, in June 2016 ATF agents and undercover informants conducted an investigation which began with an undercover informant hanging out at an Allsup's gas station and convenience store on Zuni Street near San Pablo in the City of Albuqeruqe.   The informant ultimately approached an African-American resident nicknamed "Cash" and asked Cash if Cash knew anyone who could sell him guns or drugs. The operation then proceeded after the Cash introduced the confidential informant to Mr. Casanova (who is also African American).

The informant ultimately persuaded Mr. Casanova to introduce him to an individual who could sell the informant methamphetamine.   A few days after they first spoke, Mr. Csanova arranged a sale of one ounce of methamphetamine between a white male dealer named John and the informant.   However, surprisingly, after the white male dealer sold the informant an ounce of

---

money and statistically dubious amounts of narcotics, are now facing exorbitant amounts of prison time.

methamphetamine, the white male dealer was NOT arrested and was allowed to leave the scene of the crime, but Mr. Casanova was arrested and ultimately charged in federal court.

This arrangement has all of the hallmarks of prior ATF activities, namely an "investigation" which does not involve any actual investigation of prior criminal activity, but rather involves a concocted scenario in which a confidential informant wins the trust of someone, arranges a drug transaction, and facilitates the exchange of drugs, guns and money. It also has one of the key characteristics of ATF operations challenged for racially discriminatory selective enforcement---wide latitude possessed by agents and informants to target minority populations. It is this characteristic that best explains the high percentage of African-Americans in the class of defendants arising out of the ATF sting in Albuquerque.

### B.      The ATF's history of racially discriminatory selective enforcement

The story of the ATF's racially discriminatory enforcement practices do not begin in Albuquerque. Extensive investigation by lawyers and journalists has found that the ATF has engaged, consistently and unabashedly, in a pattern of race-based selective enforcement. As an investigation by USA Today reported,

"The nation's top gun enforcement agency overwhelmingly targeted racial and ethnic minorities as it expanded its use of controversial drug sting operations . . . At least 91% of the people agents have locked up using those stings were racial or ethnic minorities."

The ATF's history in the Chicago stash house cases provide a stark example. Between 2006 and 2013, the ATF employed what it called a Stash House Operation to "identify persons and infiltrate[] groups that . . . focus their criminal activities on executing robberies, by means of force, for personal gain." The "stash house" template is the same every time. The ATF undercover agent or confidential informant offer a target an attractive opportunity to rob a stash house that contains large quantities of drugs worth thousands of dollars. The stash house, of course, is fake, and when the targets gather to "hit" the house, the agents arrest them.

The purported purpose of the stash house operation is to target the "worst of the worst." What happens, in reality, is that the ATF ends up targeting poor people and vulnerable people of color. An investigation by USA Today found that these stings target racial or ethnic minorities at a "rate . . . far higher than among people arrested for big-city violent crimes, or for other federal robbery, drug and gun offenses." Notably, this type of ATF operation—where agents are creating, rather than investigating crime---"raises particular concerns because they seek to

enlist suspected criminals in new crimes rather than merely solving old ones, giving agents and their underworld informants unusually wide latitude to select who will be targeted."

Chicago is not the only place that has witnessed the ATF's history of discriminatory and unconstitutional conduct. New York, itself no stranger to racially discriminatory law enforcement practices,[2] recently saw an ATF stash house sting that mirrored the sting used in Chicago.

## II.    Argument

### A.    *Selective Enforcement Legal Standard*

The Constitution prohibits law enforcement from engaging in selective enforcement on the basis of race. Selective enforcement claims rest on "ordinary equal protection standards." To establish a claim of selective enforcement, a defendant must demonstrate that "the defendant, compared with other similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race." *Brown v. City of Syracuse*, 673 F.3d 141, 151, 52 (2d Cir. 2012).

In order to obtain discovery in support of a selective enforcement claim, the requirement is that the defendant need only show "some evidence tending to

---

[2] *See Floyd v. City of New York*, 959 F.Supp.2d 540, (S.D.N.Y. 2013) (finding that the New York Police Department's policy of "stop and frisk" policy, the implementation of that policy, and the oversight of that

show the existence of the essential elements" of an equal protection defense. Defendants seeking discovery in support of an equal protection challenge face a lower burden than that required to prevail on the merits. *United States v. Alameh*, 341 F.3d 167, 174 (2d Cir. 2003). Specifically, defendants must provide some evidence that federal authorities have failed to target or prosecute similarly situated defendants of other races.

### 1. Proof of discriminatory effect

The stark difference between the percentage of black defendants in the defendant class and the percentage of African-Americans in the comparison classes, would be sufficient, on its own, to justify the defendant's requests. *See United States v. Paxton*, No. 13-CR-103, 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014) (noting that statistical data on races of defendants may be sufficient to establish discriminatory effect and intent).

### 2. Proof of discriminatory intent

Several factors suggest the presence of discriminatory intent. First, the stark numbers in this case illustrate that the enforcement of the 2016 Albuquerque sting was driven by a discriminatory motive to target African-American defendants. Statistically, African-Americans make up approximately 4% of the population of

---

implementation, violated both the Fourth Amendment and the Fourteenth Amendment).

Albuquerque, but they make up almost 25% of the class of defendants targeted in the ATF sting. By way of comparison, African-American defendants comprise 4-5% of defendants in federal court in the District of New Mexico.

But the evidence of discriminatory intent and effect is not limited to the austere world of numbers and a review of the ATF's general actions in this case. The defendants' evidence also has flesh and blood. The ATF investigation in this case, to the best of defendants' knowledge, focused on several areas in Bernalillo County that are comprised predominantly of minority and African-American populations. In this case the investigation proceeded from the neighborhood of Zuni and San Pablo, (also known as the "war zone") which is almost exclusively populated by lower-income people of color. Such trolling of poor neighborhoods to net targets is the unspoken calling card of the ATF's brand of racial discrimination.

And it was not just the trolling of poor neighborhoods that led to the discriminatory effect on African Americans. The comparatively high percentage of African Americans was also driven by the fact that the majority of confidential informants in this case were African-American and also that even non-African American confidential informant targeted African American neighborhood contacts like Cash and Mr. Casanova. The use of such a high percentage of

African-American confidential informants is virtually guaranteed to trigger the investigation and prosecution of individuals of the same racial and cultural background. But the ATF did not stop by just stacking the deck with African American confidential informants.

In this case the ATF's actions made Mr. Casanova's claim of selective enforcement almost inescapable.   This is so because when John (the white male source of supply) arrived on the scene to sell the confidential informant an ounce of methamphetamine, on June 6, 2016 John WAS NOT ARRESTED.   Only Mr. Casanova was worthy of the ATF's enforcement actions, even though he was little more than a middle man trying to score his own stash of drugs.   John, the white male source of supply, simply walked away with the ATF's money in his pocket and, to the best of counsel's knowledge, John remains at liberty and free to conduct his business unencumbered by a criminal charge. This image, the shackled black man and the more culpable, yet still free white man, perfectly illustrates the racially discriminatory motives the ATF employed in selecting the targets of its sting.

On January 11, 2017, counsel for Mr. Casanova provided the United States Attorney's Office with a written request for the information which counsel seeks in this motion to compel in an effort to develop sufficient facts to establish a claim of

selective enforcement.   Unfortunately that same day Assistant United States

Attorney Jack Burkhead informed counsel for Mr. Casanova that the U.S.

Attorney's Office had no intention of complying with the request for information

and he further informed counsel that the information would only be provided if

counsel pursued a Motion to Compel.   Therefore, despite counsel's effort to meet

and confer in an effort to avoid the need for this Motion, counsel seeks this Motion

to Compel.

     Assistant United States Attorney Samuel Hurtado, counsel of record for the

United States in this case, has been informed of this Motion to Compel and Mr.

Hurtado represents that the Government opposes the Motion.

     Mr. Casanova believes that he has amply satisfied his burden of showing a

need for the requested information. He has presented evidence that the ATF's

enforcement policy in this case likely ran afoul of constitutional equal-protection

principles. That is all he needs to show to warrant an order to compel discovery.

     WHEREFORE, for all of the foregoing reasons, the Defendant Yusef

Casanova respectfully requests that this Honorable Court Order the disclosure of

all of the information which Mr. Casanova seeks in order to prove a claim of the

selective enforcement of the criminal law.

     Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

***Electronically filed February 9, 2017***
/s/ Brian A. Pori
Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to the following: Assistant United States Attorney Samuel Hurtado.

*Electronically filed February 9, 2017*
/s/ Brian A. Pori
Assistant Federal Public Defender