**UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                                                    **No. CR 16-2917 JAP**

**YUSEF CASANOVA,**

    **Defendant.**

## MEMORANDUM OPINON AND ORDER

Defendant Yusef Casanova is charged in a three-count Superseding Indictment (Doc. 35) with (1) distribution of 5 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); (2) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1); and (3) possession of an unregistered firearm with a barrel length less than 16 inches and an overall length of less than 26 inches in violation of 26 U.S.C. §§ 5861(d) and 5871. On July 24, 2018, Defendant filed DEFENDANT'S OPPOSED MOTION TO DISMISS FOR THE SELECTIVE ENFORCEMENT OF THE LAW (Doc. 101) (Motion), alleging racially-based targeting by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). After an extensive discovery process,[1] the Motion has been fully briefed.[2] The Court heard evidence and argument from counsel at a two-day hearing beginning on January 14, 2019 and concluding on January 15, 2019. At the hearing, Assistant United States Attorneys James Tierney, Kimberly Brawley, and Samuel Hurtado appeared on behalf of Plaintiff United States of America.

---

[1] *See* ORDER GRANTING DISCOVERY (Doc. 57); ORDER GRANTING DISCOVERY (Doc. 83).
[2] *See* UNITED STATES' SEALED RESPONSE TO DEFENDANT'S MOTION TO DISMISS (Doc. 107); DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO THE OPPOSED MOTION TO DISMISS FOR THE SELECTIVE ENFORCEMENT OF THE LAW (Doc. 124); UNITED STATES' SEALED SUR-REPLY TO DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS (Doc. 136).

Defendant was present in the courtroom and was represented by Assistant Federal Public Defenders Brian Pori and Melissa Morris. Based on the arguments in the pleadings and the evidence in the exhibits and testimony presented at the hearing, the Court will deny the Motion.

I.  BACKGROUND

Defendant was arrested in June 2016 as the result of an ATF operation known as the Surge, the purpose of which was to reduce violent crime in Albuquerque. The Surge was an undercover operation in which ATF brought five convicted felons into the city and paid them to assist ATF in identifying potential criminals by acting as confidential informants (CIs). ATF initially limited the Surge to areas within the southeastern quadrant of Albuquerque, which had the city's highest rates of violent crime. Later, agents shifted their enforcement efforts to high-crime parts of western and southwestern Albuquerque, so that law enforcement could execute warrants resulting from the southeastern operation without jeopardizing the undercover status of the CIs or ATF agents.

ATF selected the Surge locations based on consultations with local law enforcement, including the local United States Attorney's Office, the Second Judicial District Attorney's Office, local ATF and Drug Enforcement Administration agents, the Albuquerque Police Department, and the Bernalillo County Sheriff's Office. The regions were chosen due to their high crime rates and their dense populations, with substantial levels of foot traffic that would enable the CIs to interact with potential targets without appearing suspicious. ATF was not aware of and did not consider the racial or ethnic demographics of the selected enforcement areas. The parties seem to agree that these parts of town probably have higher percentages of minority residents than some other parts of Albuquerque, but there is no evidence in the record as to the demographics of the specific areas.

ATF agents, who were to participate in the operation, chose the CIs largely based on the performance of the CIs during previous enforcement operations. Three of these CIs were black and two were Hispanic; none were white, and none were from the Albuquerque area. Lead ATF Special Agent Russell Johnson (SA Johnson) was aware of theories of implicit bias and of prior allegations of racial bias in other ATF sting operations. Nevertheless, ATF had no written tactical plan, guidelines, or targeting selection criteria for the Surge operation. The CIs were told to approach people in the target area, attempt to purchase drugs and firearms, and obtain contact information and any other potential means of identification for people who appeared to be interested in committing drug or gun crimes. The CIs were given no training or guidance on whom to approach or how to avoid bias in targeting.

After an initial encounter with a prospective target, the CIs were to report back to ATF agents with the information they had gathered. ATF then attempted to identify the individuals approached by the CIs and to ascertain whether those individuals were likely to be seriously involved in drug or firearms crimes. ATF used databases of addresses and phone numbers, vehicle information, social media, and information from local law enforcement to identify potential targets. Once a person had been identified, ATF investigated the person's criminal history through prior convictions, police reported conduct, and reputation. If the investigation revealed a history of serious crime, ATF would authorize the CI to attempt to arrange a drug or firearm transaction between the targeted individual and an undercover agent. The CIs could continue to pursue a target only if agents authorized them to do so.

Although ATF agents determined whether to target someone based on that person's prior criminal history, the Surge also resulted in the arrest of numerous defendants without prior documented involvement in serious crime. These defendants were not initially targeted by ATF,

but they were arrested after they conspired with the original target of the ATF investigation, became involved in the criminal undertaking, and were identified by ATF agents. In total, 102 defendants were arrested and charged due to the Surge operation. *See* Government's Exhibit 57; Defendant's Exhibit A.[3] Of these defendants, approximately 11 were white (11%), 63 were Hispanic (62%), 27 were black (26%), and one was Native American (1%). *See* Government's Exhibits 1–57; Defendant's Exhibit A.[4] In contrast to these figures, census data shows that the population of Bernalillo County is approximately 50.1% Hispanic, 38.9% non-Hispanic white, and only 3.4% black. Defendant asserts that black defendants typically make up approximately 5% of the defendants federally prosecuted for drug and firearm offenses in the District of New Mexico.[5]

Twenty-seven of the Surge defendants—two white, sixteen Hispanic, and nine black—were solitary arrests. *See* Government's Exhibit 57; Defendant's Exhibit A.[6] The other seventy-five defendants were arrested as conspirators, where one individual had been targeted by ATF but the targeted person had then involved others who were also arrested. *See* Government's

---

[3] Defendant's Exhibit A lists 103 defendants, but one of those is described in Government's Exhibit 58 as not having been indicted.

[4] The figures differ slightly between the parties and across different exhibits. Defendant's Exhibit A lists 11 white defendants, 63 Hispanic defendants, 27 black defendants, and one Native American defendant. Government's Exhibits 1-56 list 11 white defendants, 64 Hispanic defendants, 27 black defendants, and no Native American defendants. However, Government's Exhibit 57 lists 10 white defendants, 62 Hispanic defendants, 29 black defendants, and one Native American defendant. Further, even where the total number of defendants in a particular demographic group is the same, there are at least nine defendants whose race has been categorized differently in some exhibits than others. For example, Government's Exhibit 57 and Defendant's Exhibit A both list two white defendants arrested as part of a conspiracy, but the two labeled as white by the United States are considered Hispanic by Defendant, while two that the United States considers Hispanic have been categorized as white by Defendant. Confusingly, even Government's Exhibits 1-56 and Exhibit 57 are not in agreement. One defendant is labeled as white in Government's Exhibit 27, as black in Government's Exhibit 57, and as Hispanic in Defendant's Exhibit A.

[5] This statistic appears without citation in Defendant's Motion to Compel Disclosure of Information (Doc. 29) and has been repeated throughout this litigation. The Court does not know the source of the information but assumes its truthfulness for the purpose of deciding Defendant's Motion since it seems to be undisputed by the parties.

[6] This racial breakdown is taken from Defendant's Exhibit A because the United States does not provide complete demographic figures for the single-defendant cases in Government's Exhibits 1–56. However, at least one defendant who appears to be Hispanic in Government's Exhibit 29 has been listed as white in Defendant's Exhibit A.

Exhibit 57. Of the conspiracy cases, approximately nine defendants, or 12%, were white, forty-seven or 63% were Hispanic, one was Native American (1%), and eighteen, 24%, were black. *See* Government's Exhibit 57; Defendant's Exhibit A.[7] However, these seventy-five arrests were the result of only twenty-six initial targeting operations. *See* Government's Exhibit 57; Defendant's Exhibit A. One of the targeted individuals was white (4%), seventeen were Hispanic (65%), and eight were black (31%). *See* Government's Exhibit 17; Government's Exhibit 57; Defendant's Exhibit A.[8] The defendants who were not the original targets of ATF did not necessarily have a serious criminal history, and they might not have been pursued separately. However, they were arrested anyway if they were identified during the operation and probable cause existed for the arrest.

Some individuals were identified by ATF but were not arrested because they did not participate in criminal activity. *See* Government's Exhibit 58; Defendant's Exhibit A. Others did commit a crime, but then could not be arrested because they were not identified by ATF. *See* Government's Exhibit 58; Defendant's Exhibit A. It is difficult to quantify those not identified or not arrested because ATF did not keep records of all investigations. However, the available evidence shows that during the undercover operations in which the Surge defendants were arrested, ATF agents also took notice of at least ninety-seven other people. *See* Government's Exhibit 58; Defendant's Exhibit A.[9] Fourteen of these other individuals were arrested by ATF, but then prosecution was either declined or referred to the state. *See id.* Seventy-one did not

---

[7] These numbers are taken from Defendant's Exhibit A. Government's Exhibits 1–56 reflect 10 white defendants, 47 Hispanic defendants, 18 black defendants, and no Native American defendants. Government's Exhibit 57 shows 9 white defendants, 45 Hispanic defendants, 20 black defendants, and one Native American defendant.

[8] Government's Exhibit 57 states that two of the targeted individuals were white, 16 were Hispanic, and 8 were black. However, one of the targets categorized as white is described as Hispanic in both Defendant's Exhibit A and Government's Exhibit 17.

[9] Government's Exhibit 58 lists ninety-nine people; two of these individuals were indicted, although the indictments were later dismissed. Those two are included in the statistics of Surge defendants.

5

participate in any criminal activity, so there was no probable cause for their arrest. *See id.* Eight were reported by defendants as sources of supply but did not interact with agents and were not identified, so they also could not have been arrested. *See id.* It appears that of the ninety-seven, agents observed four people participating in criminal activity who were not arrested. *See id.* Of these four, two were black, one was Hispanic, and one was white. *See id.* None of the four were identified by ATF. *See id.*

One of those not identified and not arrested was Defendant's methamphetamine supplier; a white man. In Defendant's case, one of the black CIs first approached a black man named Joseph Mosley, also known as "Cash," at a gas station in the southeastern targeted region. The CI asked if Mr. Mosley knew anyone who could sell the CI firearms or two ounces of methamphetamine. Mr. Mosley said that he could sell methamphetamine to the CI, and ATF agents authorized further investigation. However, Mr. Mosley never produced any drugs. Instead, he gave the CI the phone number of a man named Curtis and asked for a finder's fee if Curtis was able to supply the CI with drugs. The CI spoke to Curtis over the phone several times but was not able to arrange an in-person meeting.

Mr. Mosley then gave the CI a phone number for Defendant, as another possible source of drugs and firearms. ATF agents identified Defendant through his phone number, which was connected to his social media accounts. Agents then obtained Defendant's criminal record, which was extensive, from NCIC and authorized the CI to pursue Defendant. The CI contacted Defendant by phone, and Defendant expressed interest in arranging a sale of methamphetamine. Defendant also said that he had one firearm he could sell, and he could get more. Defendant informed the CI that he personally did not sell methamphetamine, but that he had a good supplier with whom he had spent time in prison.

On June 7, 2016, the CI and an undercover ATF agent met with Defendant to purchase the firearm and methamphetamine in a transaction that was captured on video. Defendant sold a sawed-off rifle to the agent, along with a magazine and ammunition. The CI, the agent, and Defendant then waited for Defendant's methamphetamine supplier to arrive. Defendant telephoned the supplier repeatedly. After about 20 minutes, the supplier, who was a white male, arrived as a passenger in a small grey car. The supplier got out of the small grey car and walked past the agent as the agent introduced himself. The agent testified that the supplier did not give a name in response, but Defendant contends that the supplier replied that his name was "John."[10] The supplier then got into Defendant's car with Defendant. Next, Defendant exited his vehicle, got into the agent's car, and gave the methamphetamine to the agent. The agent gave Defendant $600. Defendant got out of the agent's car and back into his own car with "John." "John" then got out of Defendant's car and got back into the grey car, which left. Defendant left separately in his own car. The agent and the CI left together in the agent's car.

After this transaction, ATF agents attempted to identify the supplier so that they could arrest him. Agents first focused on the license plate of the grey car, which had been captured by surveillance. However, the supplier was not the registered owner of the vehicle and agents were not able to link the owner to anyone appearing to be "John." ATF did not attempt to interview the registered owner because that could have jeopardized the undercover nature of the ongoing Surge operation. Instead, ATF consulted with local law enforcement and investigated known associates of Defendant. These efforts were unsuccessful; the methamphetamine supplier was never identified, and consequently he was not charged. Mr. Mosley and Curtis were not charged because they did not participate in any drug or firearm transactions and had no in-person contact

---

[10] The audio recording is unclear, but the supplier may have said "John."

with the undercover agent. A warrant was issued for Defendant's arrest, but at that time he was already in custody on state charges. By the time ATF agents located Defendant and transferred him into federal custody, Defendant was already represented by counsel. Hence, ATF agents were unable to interview Defendant as to his supplier's identity or attempt to obtain from Defendant a phone number or other potential means of identification for the supplier.

Defendant is a black man. He argues that the Court should dismiss the charges against him because ATF selectively enforced the law by targeting black people, so that Defendant's race made it more likely that he would be identified, pursued, and arrested than if he had been white. The United States denies that race was a factor in ATF's enforcement decisions.

## II. DISCUSSION

A selective enforcement claim is an equal protection challenge, which requires Defendant to prove that the ATF investigation "had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Although *Armstrong* addresses selective prosecution rather than selective enforcement, the essential elements and standard of proof are the same, requiring Defendant to present clear evidence of both discriminatory effect and discriminatory purpose. *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[T]he standard for proving a selective-enforcement claim should be, as with selective-prosecution claims, 'a demanding one.'" (quoting *Armstrong*, 517 U.S. at 463)); *United States v. Hernandez-Chaparro*, 357 F. App'x 165, 166 (10th Cir. 2009) ("Those seeking to establish an equal protection claim based on selective law enforcement face a high burden: they must dispel the presumption that a law enforcement official has not violated the Equal Protection Clause with 'clear evidence to the contrary.'" (quoting *Armstrong*, 517 U.S. at 465)). Courts are reluctant to interfere with law enforcement discretion, just as they are with

the prosecutorial discretion of the executive branch. *See Alcaraz-Arellano*, 441 F.3d at 1264. Accordingly, Defendant bears a heavy burden of proof. *Id.*

Defendant relies primarily on the statistics of the Surge, in which a greater percentage of those arrested were black than is proportionally representative of Bernalillo County demographics or typical for drug and firearm charges in the District of New Mexico. Additionally, Defendant provides anecdotal evidence that he was arrested while his white source of supply, and perhaps other non-black sources of supply, were not. Finally, Defendant argues that these statistical disparities can be explained only by theories of unconscious or implicit bias, and that ATF's failure to protect against the effects of bias is the equivalent of purposeful discrimination. The United States maintains that Defendant has not met his heavy burden to prove selective enforcement.

A.   **Discriminatory Effect**

"To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong* 517 U.S. at 465. "If such a claim is based on the investigative phase of the prosecution, however, the defendant must instead make a credible showing that a similarly-situated individual of another race could have been, but was not, arrested or referred for federal prosecution for the offense for which the defendant was arrested and referred." *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001).

"The defendant may satisfy the 'credible showing' requirement by identifying a similarly-situated individual or through the use of statistical evidence." *Id.* However, discriminatory effect cannot be proven "by providing statistical evidence which simply shows that the challenged government action tends to affect one particular group." Instead, "proffered

9

statistics must address the critical issue of whether that particular group was treated differently than a similarly-situated group." *Id.*

"[S]tatistical evidence in selective-enforcement cases must include (1) reliable demographic information, (2) some manner of determining whether the data represents similarly situated individuals, and (3) information about the actual rate of occurrence of the suspected crime across relevant racial groups." *United States v. Alabi*, 597 F. App'x 991, 997 (10th Cir. 2015). Individuals are similarly situated when there are no legitimate distinguishing factors that could justify a difference in the enforcement decisions. *United States v. DeChristopher*, 695 F.3d 1082, 1097 (10th Cir. 2012).

Defendant asserts that clear statistical evidence shows discriminatory effect because black individuals were disproportionately arrested during the Surge. As compared to the usual demographics for drug and gun charges in the District of New Mexico, a far higher percentage of the Surge defendants are black. The statistical disparity between the percentage of black Surge defendants and the percentage of black residents in the population of Bernalillo County is even greater. However, these figures do not necessarily represent similarly-situated individuals because they reflect the entirety of Bernalillo County, or even the entire District of New Mexico. Because the Surge enforcement efforts were geographically limited to certain small parts of Albuquerque, individuals outside the areas targeted by ATF would not have been subject to arrest during the Surge operation. Consequently, the Court cannot rely on comparison of the Surge statistics with those of federal drug and firearm defendants in the District of New Mexico as a whole. While the Bernalillo County population statistics are more geographically relevant than those pertaining to the entire District of New Mexico, they say nothing about crime rates.

Defendant failed to present any demographic information specific to the parts of Albuquerque targeted during the Surge beyond the general testimony that these are neighborhoods with high percentages of minority residents. Defendant has not provided any information about the actual rate of occurrence of firearm or drug crimes across racial groups within the targeted areas. Nor is there any evidence that the broader numbers he relies on for comparison to the Surge accurately reflect the general rate of occurrence of firearm and drug crimes across the relevant racial groups within the neighborhoods at issue. Despite the statistical disparities, the percentages of each race arrested say nothing about similarly-situated individuals who could have been arrested but were not. *See Armstrong*, 517 U.S. at 470 (concluding that a study which stated that 100% of the 21 U.S.C. §§ 841 and 846 cases handled by the Los Angeles Federal Public Defender's Office in 1991 involved black defendants did not tend to show discriminatory effect because the study failed to identify non-black persons who could have been prosecuted for those same offenses, but were not). Consequently, the Court finds that the statistics of the Surge operation are insufficient to prove discriminatory effect.

Defendant argues further that black targets were treated differently than similarly situated white individuals who were not investigated, identified, or arrested in the same manner as black people. Defendant asserts generally that black individuals who were present at drug or firearm transactions were more likely to be identified, pursued, and arrested than white people who were present. Defendant contends specifically that ATF failed to arrest one white male who was identified through NCIC as a fugitive and failed to identify and arrest two white males who were sources of supply for another defendant, even though they were at the scene with her and she had identified them. However, Defendant did not provide any evidence that would allow the Court to

11

evaluate the relevance of these situations and whether any of the non-black individuals were similarly situated to Defendant.

Defendant's primary argument is that his white methamphetamine supplier "John" is a similarly situated individual who could have been arrested but was not. "John" clearly served as the source of supply in the drug transaction leading to Defendant's arrest, but ATF agents were unable to identify "John" so that he could also be arrested. Defendant argues that ATF failed to meaningfully investigate "John" to ascertain his identity because agents did not interview the registered owner of the vehicle in which "John" arrived and did not obtain a phone number for "John." Defendant contrasts this investigation with ATF's identification of Defendant through his phone number, which had been given to the CI. However, SA Johnson testified that it would have jeopardized the ongoing undercover Surge operation if agents had interviewed the vehicle owner, and that ATF was unable to obtain a phone number for "John" from Defendant because he was represented by counsel and could not be interviewed. Although ATF did not exhaust every possible means of determining the supplier's identity, the difficulty of pursuing that identification as compared to the identification of Defendant is unknown. Testimony established that Defendant's phone number was provided to the CI, and when investigated, the phone number was not registered in Defendant's name but was linked to Defendant's social media accounts. Even if ATF had been able to interview Defendant or had subpoenaed his phone records to obtain a phone number for "John," there is no evidence that the number would have revealed the supplier's identity. The Court finds that ATF agents made reasonable efforts to identify "John" through the available means, and it will not second-guess agents' decisions as to the security needs or enforcement priorities of the operation. The fact that the supplier could not be identified through reasonable efforts provides a legitimate distinguishing factor between

"John" and Defendant. Accordingly, Defendant has not carried his burden to present clear evidence that "John" was similarly situated yet not arrested. In sum, Defendant has not provided clear evidence of discriminatory effect.

### B. Discriminatory Purpose

Although Defendant's failure to prove discriminatory effect is fatal to his claim, the Court will analyze both of the essential elements of selective enforcement in the interests of completeness. "[T]he discriminatory-purpose element requires a showing that discriminatory intent was a 'motivating factor in the decision' to enforce the criminal law against the defendant." *Alcaraz-Arellano*, 441 F.3d at 1264. "Statistical evidence can be used to show both discriminatory effect and discriminatory purpose." *Blackwell v. Strain*, 496 F. App'x 836, 840 (10th Cir. 2012). However, "[s]tatistical evidence alone is rarely enough to show discriminatory purpose." *Id.* This is because the challenged action must have been undertaken "at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985) (internal quotation marks omitted).

Defendant argues that the design and methods of the Surge operation, combined with ATF's history of past accusations of biased enforcement, demonstrate discriminatory intent due to ATF's failure to establish any tactical plan to guard against known risks of selective enforcement. Defendant asserts that ATF focused its enforcement efforts on an area of Albuquerque with a high percentage of black residents and targeted black-owned businesses within that area. He contends that ATF's use of only black and Hispanic CIs was likely to lead to greater contact with minority targets. Defendant further argues that the CIs disproportionately solicited poor drug addicts of color, used drugs with the targeted individuals, and promised them finders' fees to entice them into committing crimes. Defendant states that ATF has been accused

13

of bias previously based on its use of similar tactics, and he argues that the CIs did not use these methods with non-black targets. Finally, Defendant contends that both CIs and ATF agents were more likely to target black individuals due to their unconscious biases against black people. He maintains that ATF knew that its approach would disproportionately implicate black people but put no race-neutral guidelines in place to minimize or avoid this result.

However, Defendant concedes that the law on selective enforcement claims requires him to prove more than ATF's awareness that the operation would have a disproportionate adverse effect on black people as compared to white people or any other race. Even if everything Defendant states regarding the operation's design and impact is accurate, this evidence only demonstrates awareness, rather than purpose. The United States presented credible testimony that ATF selected the target areas due to their high crime rates, and Defendant has not provided any evidence suggesting that the neighborhoods were chosen because of their minority populations, or that ATF was even aware of the demographics of the targeted areas when it made its choices. SA Johnson testified that the CIs were chosen based on their past performances in previous operations, irrespective of their race. Defendant has not presented any evidence demonstrating that the use of black CIs was intended to implicate black individuals in crime, or that the CIs used techniques against black people that they did not use with targets of other races. Past accusations against ATF of biased enforcement are troubling, just as Defendant's claims are in this case. But those allegations involved different types of operations in different states, and they do not support Defendant's claim that ATF's actions during the Surge constituted selective enforcement against him.

Defendant asks the Court to infer intentional discrimination from the design and methods of the Surge operation because ATF agents were aware of theories of unconscious bias, yet failed

to guard against the effects of bias in their enforcement.[11] It is certainly possible that ATF could have chosen a different strategy that might have resulted in the arrest of fewer black defendants. However, Defendant has not presented clear evidence that ATF chose these tactics because of, rather than in spite of, their disproportionate impact. Accordingly, the Court concludes that Defendant is not entitled to dismissal of the indictment based on impermissible selective enforcement.

      IT IS THEREFORE ORDERED that DEFENDANT'S OPPOSED MOTION TO DISMISS FOR THE SELECTIVE ENFORCEMENT OF THE LAW (Doc. 101) is DENIED.

                                                                                        */s/ James A. Parker*
                                                                       SENIOR UNITED STATES DISTRICT JUDGE

---

[11] Defendant attempted to present evidence on the theory of unconscious bias, but the Court excluded the testimony of Defendant's proposed expert after finding that it would not help the Court to determine a fact in issue since unconscious bias is, by its nature, not intentional discrimination and would not satisfy Defendant's burden to prove purpose.